## T. H. LUCKIE v. THE STATE.

### *No. 507. Decided November 10.*

1. **Continuance—Bill of Exceptions—Practice on Appeal.**—The overruling of an application for continuance will not constitute a subject for revision on appeal where no bill of exceptions was reserved to the action of the court.

2. **Evidence—Deposition Taken in Another Civil Case.**—The deposition of a witness taken in a civil suit is inadmissible as evidence on a criminal trial.

3. **Charge—How Construed.**—A charge of the court should be construed as a whole, and though isolated portions may be justly subject to criticism, yet if, taken as a whole, the obnoxious portions are so corrected as that they could not have misled the jury nor have injured the accused, they can not constitute reversible error.

4. **Seduction—Indictment—Single or Married Man.**—An indictment for seduction which sets forth the acts constituting the offense in the language of the statute, is sufficient, and it is not required that it should allege that the accused was either a single or a married man.

5. **Conflicting Evidence—Practice on Appeal.**—It is the province of the jury to settle conflicts in the evidence, and the court on appeal will affirm the judgment if the evidence which supports the verdict is, in its opinion, sufficient.

APPEAL from the District Court of Mills. Tried below before Hon. W. A. BLACKBURN.

This appeal is from a conviction for seduction, the punishment being assessed at two years' imprisonment in the penitentiary.

The important facts connected with this transaction will be found in the testimony of the prosecutrix, as follows, to wit: "My name is Missouri Emma Morrison. I will be 20 years old in April next. I live with my father's family, in the northern part of Mills County; have lived where we now live for seven or eight years. I know T. H. Luckie, the defendant. I got acquainted with him in the summer of 1890, at my father's house. Defendant began visiting me at home in December, 1890, and came to see me Christmas week. He visited me afterwards in the month of January, 1891, coming about once a week. When he first began to come to see me I was between 16 and 17 years old. Sometimes he came twice a week, stopping as he would be coming from Mullen. In January, 1891, he made love to me; and he visited me the same way through the month of February, 1891, making love to me and telling me that he loved me; and I told him that I loved him; and in February, 1891, he asked me to marry him and become his wife. I loved him, and told him that I would marry him. Our house has two rooms, one being the dining room and kitchen. We did most of our talking in the dining room and kitchen. Usually when he came to see me it would be late in the evening. He would take supper with us, and he and I would stay in the kitchen and talk after the rest of the family had gone out. After we became engaged to be married, in February, 1891, at my father's house, he wrote me this little note. I saw him write it, and he gave it to me."

This note, put in evidence, reads as follows:

"The rose is red, the stem is green,
The days is past that we have seen;
The days to come, they are but few,
And I hope to spend them all with you."

"Written to Miss Emma, by T. H. L."

"The defendant, T. H. Luckie, also wrote this little note to me at my father's house. I saw him write it, and he gave it to me."

It is offered in evidence, and reads as follows:

"The moon in due seizen
May seice to give lite,
The stars from heaven
May all fall in one nite;
In the middle of ocean
Will grow a green tree,
If ever *I* prove false to dear Emma."

"T. H. Luckie, the defendant, wrote me this note at my father's house also."

It is offered in evidence, and reads as follows:

"I will go home displeased; it hurts me for a girl I think so much of to treat me so. I will think over the matter. I may desire to call again to see you. I remain, as ever, a friend to you.

"T. H. LUCKIE."

"At the time he wrote these notes we were engaged to be married. At the time he wrote the last one he had been trying to have carnal intercourse with me. I refused, and he did not like it, and he went away displeased. He came in about a week again. He then told me that he loved me; said, 'I know you are a good, virtuous girl. I am a man of my word; I will never go back on you; I will marry you.' He told me I ought to have more confidence in him than to refuse. He said to me, 'I won't marry you unless you yield.' I loved him, and permitted him to have carnal intercourse with me. This was the 5th of May, 1891, and this was the first time I had ever had intercourse with a man. He told me that he loved me better than any one he ever saw. I relied upon his promise to marry me. He told me that we were engaged to be married, and would marry as soon as we could. He said that he would not marry any girl that would not submit to him and do what he wanted to. I had confidence in him. He told me if I did not yield to him I would be sorry for it. I believed that he would keep his promise and marry me, as he said that he would, and I yielded to him, and he first had carnal intercourse with me in the dining room, at my father's house, on the night of May 5, 1891, in

Mills County, Texas. I consented on account of my love for him, and his promise of marriage. He had carnal intercourse with me several times after this, nearly every time in my father's dining room. We had intercourse at some other place, but I have forgotten where. The defendant is the only sweetheart I ever had; he is the only man that ever came to see me. I went to church once with defendant, and to a picnic, and to a show. I never did love any other man but the defendant. Defendant came to see me every week, nearly, till about November, 1891. I told him that I was pregnant by him. He laughed at me, and said there was nothing more the matter with me than with him. He told me to take turpentine—take ten, twenty, fifty, or one hundred drops, and it would cure me. I told him we ought to get married, as he had promised; that we ought not to be living the way we were; and he said we would marry as soon as we could. I spoke to him of it several times, and he said that we would marry as soon as we could. He kept on coming frequently till November 1, 1891, and on February 16, 1892, I gave birth to a child. T. H. Luckie, the defendant, is the father of my child. I never had carnal intercourse with any one else but this defendant. This was in Mills County, Texas, in 1891."

Cross-examined: "I never went with any other young men. I rode home with W. D. Fisher once. My brother and wife were along in a wagon ahead of us. We did not stop on the way. I went to the neighbors' houses by myself sometimes. W. D. Fisher did not visit me; he was at our house often with the boys. I know R. F. Peyton. The first time I ever saw him he came to our house in company with the defendant, and took supper there. I don't remember whether George Black was with them or not. The defendant did not have carnal knowledge of me before the 5th of May, 1891. I never did go with R. F. Peyton anywhere. He came to our house with defendant in December, 1890, and I did not see him any more till June of 1891. R. F. Peyton has been at our house several times; I can't say how many. I did not propose to defendant, as we went home from the show, for us to drop behind. W. D. Fisher married a relative of mine, in August, 1891. I became pregnant between the 5th and 15th of May, 1891. I told the defendant I was pregnant in July, 1891."

The testimony of the prosecutrix as to the frequent visits of Luckie to her is corroborated by several of her family; and her father testified to an admission to him by defendant that he had promised to marry the prosecutrix; but the defendant's father told him that she could not prove it, and that he could beat the case.

The prosecutrix's character for truth and veracity was proved good by all the witnesses examined on that subject; and all who testified as to her character for chastity, testified that it had been good up to this occurrence.

Defendant, as a witness in his own behalf, admitted to frequent acts of sexual intercourse with the prosecutrix, but denied that he had ever promised to marry her.  He also proved by one Jasper Gordon that he, the witness, had seen the prosecutrix and one R. F. Peyton in the act of carnal intercourse, at the house of defendant's brother-in-law, Amonett.  Also, by John Peyton, that he had witnessed an act of sexual intercourse between the prosecutrix and one W. D. Fisher, in the woods on one occasion.  This was contradicted and denied by W. D. Fisher as a witness, and several witnesses testified, that the reputation of both Jasper Gordon and John Peyton for truth and veracity was bad.

It was also shown by the evidence, that besides this prosecution for seduction defendant had also been prosecuted for fornication, growing out of his illicit intercourse with prosecutrix, and had been sued in a civil action for damages by the prosecutrix.  In this civil suit for damages the defendant had taken the deposition of R. F. Peyton, and one of his bills of exception shows:

"Upon the trial, after the testimony of Gordon, John Peyton, W. L. Amonett, and others, defendant produced in court and offered in evidence the direct and cross-interrogatories to and answers of witness R. F. Peyton taken in case number 1415, M. E. Morrison et al. v. T. H. Luckie, in District Court of Lampasas County, Texas, in which case J. L. Lewis, who is representing the State in this case, is an attorney, asking that, inasmuch as the court had refused a continuance on account of the absence of R. F. Peyton, that he be allowed to use same as secondary evidence, which upon objection of the district attorney was refused.  Defendant then exhibited said depositions and their contents to the court, showing specific acts of unchastity on the part of the prosecuting witness M. E. Morrison, and again offered them in evidence, which was again upon objection excluded.  Defendant then excepted and took his bill of exception."

Defendant reserved no bill of exception to the overruling of his application for a continuance on account of absent testimony of his witness R. F. Peyton.

After verdict defendant made the following motion in arrest of judgment, which was overruled:  First, because said indictment in this cause charges no offense against the laws of Texas; second, because said indictment fails to charge that the defendant was either a married or a single man; third, because the indictment fails to charge that the defendant was a single man; fourth, because said indictment fails to charge that defendant was a married man, and that the fact was unknown to the party charged to have been seduced; fifth, because said indictment does not allege in affirmative language the acts necessary to constitute seduction.

That portion of the charge which was excepted to and complained of as error is set out in the opinion below.

*Triplett & Doughty,* for appellant.—The court erred in overruling defendant's motion in arrest of judgment.

Every fact which is a constituent element of the offense must be alleged distinctly and affirmatively in the indictment.

Where the statute uses generic terms it is necessary to state the species according to the facts. The State v. West, 10 Texas, 553; Brewer v. The State, 5 Texas Crim. App., 248; Vaughn v. The State, 9 Texas Crim. App., 563; Longenotti v. The State, 22 Texas Crim. App., 61; Burch v. The Republic, 1 Texas, 608; Gray v. The State, 7 Texas Crim. App., 10; Kerry v. The State, 17 Texas Crim. App., 179.

The word "person" is a generic term, as used in article 814 of the Penal Code. The indictment says T. H. Luckie "did." Article 817 of the Penal Code exempts married men if the fact of marriage is known to the woman.

The statute contemplated that this offense could only be committed by a man—a single man, or a married man, if the fact of marriage was unknown. It devolves upon the State to prove the defendant to be a man, and the status, i. e., either a single man or a married man concealing his marriage; and this notwithstanding that the article defining the offense uses the word person instead of man—article 817 controlling and limiting article 814. Hence the status of the man must be alleged.

The court erred in its general charge to the jury in making the defendant's defense depend (if it should have been proved that before the defendant had carnal knowledge of prosecuting witness she had already lost her virtue) upon whether or not at the time she yielded to him she did so merely from lust and passion, and not whether she had previously had carnal intercourse with other men; defendant insisting that if she had already lost her virtue there could be no seduction.

Whether or not the party charged to have been injured consented to the carnal knowledge merely from motives of lust or passion, or because of promise of marriage, can not affect the innocence of the defendant if she had already lost her virtue, and this whether the defendant knew it or not. Mrous v. The State, 31 Texas Crim. Rep., 597.

According to the charge of the court, no matter how steeped in lust and debauchery the alleged injured party may be, yet if, at the time of the transaction upon which the indictment is found, she was not merely receiving gratification, the defendant would be guilty. This charge was cruelly calculated to mislead the jury.

The verdict of the jury was without evidence to the promise of marriage, and without evidence of seduction, or blandishments, or leading astray. Mrous v. The State, 31 Texas Crim. Rep., 597; Putman v.

The State, 29 Texas Crim. App., 454; McCarkey v. The State, 22 So. W. Rep., 511.

In a prosecution for seduction, the evidence of the alleged seduced party as to promise of marriage must be corroborated. Code Crim. Proc., art. 741; Acts 22nd Leg., chap. 33; Cole v. The State, 40 Texas, 147; Putman v. The State, 29 Texas Crim. App., 454.

Appellant insists that there is no corroboration of the witness Miss M. E. Morrison in the record as to promise of marriage and seduction. That she submitted herself to R. F. Peyton and W. D. Fisher is in evidence, and not denied; and the only pretext that the jury could have had for their verdict was the unwarranted charge of the court as to whether she submitted merely from lust or passion, which, if a fact, was not capable of proof; and the defendant was, under the paragraph of the charge complained of, called upon to do an impossible thing, viz., to prove with what motive the prosecuting witness submitted her person to his embrace. And it is again submitted, that it is not possible for the hand of the law to "tear away the veils she wove to hide her foulness." And therefore, though every thought of her heart may have been evil, and her motive the most debauched, this defendant's defense is wrested from him by the charge, unless in some manner "Truth, the divinity," saw fit to descend and clear up matters at the play's fifth act.

. *R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—Seduction. Appellant applied for a continuance in this case to obtain the testimony of R. F. Peyton. This application was refused. We will not revise the ruling of the court upon this motion, because no bill of exceptions was reserved thereto. Miss Morrison, the prosecutrix in this case, with others, sued appellant for, we suppose, a breach of promise to marry. The deposition of Peyton was taken in that suit. Upon this trial, appellant proposed to introduce in evidence Peyton's deposition. The State objected, because the deposition pertained to a civil suit with different parties, etc. The court sustained the objection, and appellant excepted. This ruling was correct. The State was not a party to that suit.

There was evidence tending to show that prosecutrix had yielded her person to other men. The court, upon this phase of the case, instructed the jury: "(1) That, although you may believe there was a promise of marriage and carnal intercourse between the parties, yet if, at the time of such promise, if any, or such intercourse, if any, said female had already lost her virtue, and that she yielded to the carnal intercourse charged merely from an appeal to her lust or passion, then you can not find defendant guilty of seduction. (2) In other words, if you believe from the evidence that defendant and said

Emma Morrison did have carnal intercourse with each other, as charged, and that the said female yielded to such intercourse on account of defendant's promise to marry her, yet, if you further believe from the evidence, or if you have a reasonable doubt as to whether or not, prior to such alleged intercourse, she had had carnal intercourse with any other man, then you must acquit defendant." The first part of the charge is objected to by appellant, upon the ground that it makes no difference as to whether she yielded through passion or some other inducement. Being without virtue, she was not the subject of seduction. This criticism is just, but, when the charge is taken as a whole, the instructions on this phase of the case could not have misled the jury. The second paragraph took from the first all that which was obnoxious, and in very plain language instructed the jury to acquit defendant if Miss Morrison "had had" intercourse with any other man.

Regarding the motion in arrest of judgment, it was not necessary for the indictment for this offense to state that the accused was a married man, or that he was a single man. The acts constituting seduction were set forth in the language of the statute, which is sufficient for this offense.

Under the facts of the case, we would not be justified in reversing the judgment because the verdict is not sustained by the evidence. The jury settled all conflicts in the evidence, and, looking to that which supports the verdict, we think it sufficient.

The judgment is affirmed.

*Affirmed.*

Judges all present and concurring.